# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| ATLAS DATA PRIVACY CORPORATION, *et al.*, | Case No.: 1:24-cv-07324-HB |
| *Plaintiffs,* | Civil Action |
| v. | |
| US DATA CORPORATION, *et al.*, | |
| *Defendants.* | |

---

## US DATA CORPORATION'S OPPOSITION TO PLAINTIFFS' 12(b)(6) MOTION TO DISMISS COUNTERCLAIMS

---

**GREENSPOON MARDER LLP**
Kelly M. Purcaro, Esq.
Kory Ann Ferro, Esq.
One Gateway Center, Suite 2600
Newark, New Jersey 07102
Tel.: (732) 456-8734 or 8746
Kelly.Purcaro@gmlaw.com
KoryAnn.Ferro@gmlaw.com

*Attorneys for Defendant US Data Corp.*

# TABLE OF CONTENTS

**Page**

I.    PRELIMINARY STATEMENT ..................................................................1

II.   STATEMENT OF FACTS .......................................................................1

    A.   Atlas Created a Mass Litigation Scheme Exploiting Daniel's Law ...............................................................................................1

    B.   Atlas Ignored USD's Opt-Out Platform and Launched Spam Attack ...........................................................................................2

    C.   USD Acted Promptly and in Good Faith to Address the Requests ........................................................................................3

    D.   Court-Ordered Lists Confirm Atlas' Intentional System Overload .......................................................................................5

    E.   Atlas' Conduct Constituted Unauthorized Computer Access and Caused Substantial Damage .......................................................6

    F.   Atlas' Deliberate and Malicious Misrepresentations and Interference ...................................................................................7

III.  LEGAL STANDARD ............................................................................8

IV.   LEGAL ARGUMENT ............................................................................9

    A.   USD sufficiently alleges Atlas violated the CFAA ............................9

        1.   Unauthorized Access / Exceeding Authorized Access (§ 1030(a)(2)(C); § 1030(e)(6)) ..................................14

        2.   Damage and Loss; $5,000 Aggregate Threshold (§ 1030(e)(8), (e)(11)) ..............................................15

        3.   Subsection-Specific Elements Are Met ...........................16

            i.    § 1030(a)(2)(C) – Obtaining information from a protected computer without authorization or by exceeding authorized access. ...........................16

            ii.   § 1030(a)(4) – Knowing access with intent to defraud, furthering the fraud to obtain anything of value. ...................................................16

            iii.  § 1030(a)(5)(A) — Knowingly causing the transmission of information and, as a result, intentionally causing damage without authorization ......17

            iv.   Causation ...................................................17

i

B.  USD Sufficiently Pled a Claim for relief under CROA......................17

   1.  USD Adequately Alleges the First CROA Element.................18

   2.  USD Adequately Alleges the Second CROA Element.............20

   3.  Atlas is Wrong on the Law and the Facts for CROA ..............21

C.  USD Sufficiently Pled a Claim for Relief for Tortious
    Interference.......................................................................22

   1.  Reasonable Expectation of Economic Benefit Plausibly
       Pled...........................................................................23

   2.  Malicious Interference by Atlas is Sufficiently Pled...............24

   3.  Resulting Losses is Plausibly Pled...........................................25

D.  USD Sufficiently Pled a Claim for Relief for Fraud...........................26

   1.  Atlas made Material Misrepresentations ...................................29

   2.  Atlas Knew Representations were False and Intended
       Reliance.....................................................................33

   3.  USD Reasonably Relied and Sustained Damages as
       a Result.....................................................................36

E.  USD Sufficiently Pled a Claim for Relief for Civil Conspiracy.........37

V.  CONCLUSION.............................................................................39

# TABLE OF AUTHORITIES

**Page(s)**

<u>**Cases**</u>

*Advanced Fluid Sys., Inc. v. Huber*,
   28 F. Supp. 3d 306 (M.D. Pa. 2014) .......................................................... 9, 14, 17

*Am. Online, Inc. v. Nat'l Health Care Disc., Inc.*,
   121 F. Supp. 2d 1255 (N.D. Iowa 2000) .................................................. 11, 15, 17

*Andritz, Inc. v. S. Maint. Contractor, LLC*,
   No. 3:08-CV-44(CDL), 2009 WL 10674137 (M.D. Ga. Feb. 4, 2009) ............... 9

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ........................................................................................ 8

*Austar Int'l Ltd. v. AustarPharma LLC*,
   425 F. Supp. 3d 336 (D.N.J. 2019) ................................................................ 25

*Auto. Res. Mgmt. LLC v. Favo*,
   No. CV 21-2630 (SRC), 2022 WL 1080991 (D.N.J. Apr. 11, 2022) ................. 18

*Automated Salvage Transp., Inc. v. NV Koninkliijke KNP BT*,
   106 F. Supp. 2d. 606 (D.N.J. 1999) ................................................................ 29

*Avaya Inc., RP v. Telecom Labs, Inc.*,
   838 F.3d 354 (3d Cir. 2016) ........................................................... *passim*

*B & B Microscopes v. Armogida*,
   532 F. Supp. 2d 744 (W.D. Pa. 2007) ............................................... *passim*

*Basic Inc. v. Levinson*,
   485 U.S. 224 (1988) ....................................................................................... 32

*Bell Atlantic Corp. v. Twombly*,
   550 U.S. 544 (2007) ....................................................................................... 8

*Brooks v. AM Resorts, LLC*,
    954 F. Supp. 2d 331 (E.D. Pa. 2013) ...................................................................12

*Caspersen as Tr. for Samuel M.W. Caspersen Dynasty Tr. v. Oring*,
    441 F. Supp. 3d 23 (D.N.J. 2020) ............................................................. *passim*

*Castrol Inc. v. Pennzoil Co.*,
    987 F.2d 939 (3d Cir. 1993)......................................................................... 31, 33

*Christie v. Nat'l Inst. for Newman Stud.*,
    No. CV 16-6572 (FLW), 2019 WL 1916204 (D.N.J. Apr. 30, 2019) ..................9

*Cline v. Reetz-Laiolo*,
    329 F. Supp. 3d 1000 (N.D. Cal. 2018) ............................................................12

*Craftmatic Sec. Litig. v. Kraftsow*,
    890 F.2d 628 (3d Cir. 1989)...........................................................................9, 33

*Dello Russo v. Nagel*,
    358 N.J. Super. 254 (App. Div. 2003) ..............................................................24

*Ewing v. Cumberland Cnty.*,
    152 F. Supp. 3d 269 (D.N.J. 2015) ...................................................................38

*Fairway Dodge, L.L.C. v. Decker Dodge, Inc.*,
    191 N.J. 460 (2007)...........................................................................................17

*Farmers Ins. Exch. v. Auto Club Grp.*,
    823 F. Supp. 2d 847 (N.D. Ill. 2011) .............................................. 10, 12, 15, 16

*Farris v. Cnty. of Camden*,
    61 F. Supp. 2d 307 (D.N.J. 1999) .....................................................................38

*Ferring Pharms. Inc. v. Watson Pharms., Inc.*,
    No. 2:12-CV-05824 (WJM), 2014 WL 12634303 (D.N.J. Aug. 4, 2014) ..........18

*Fidlar Techs. v. LPS Real Est. Data Sols., Inc.*,
    810 F.3d 1075 (7th Cir. 2016) ................................................................... 13, 17

*Fineman v. Armstrong World Indus.*,
   980 F.2d 171 (3d Cir. 1992)................................................................23

*Frederico v. Home Depot*,
   507 F.3d 188 (3d Cir. 2007)................................................................33

*Freeman v. Giuliani*,
   No. CV 21-3354 (BAH), 2022 WL 16551323 (D.D.C. Oct. 31, 2022) .............38

*Gaetano v. Gilead Sciences, Inc.*,
   529 F. Supp. 3d 333 (D.N.J. 2021) ......................................................20

*Gross v. Coloplast Corp.*,
   434 F. Supp. 3d 245 (E.D. Pa. 2020) ............................................9, 35

*Heartland Payment Sys., LLC v. Carr*,
   No. 318CV09764BRMDEA, 2021 WL 302918 (D.N.J. Jan. 29, 2021) .............23

*Hillsborough Rare Coins, LLC v. ADT LLC*,
   No. CV 16-916 (MLC), 2017 WL 1731695 (D.N.J. May 2, 2017)....................37

*In re Adams Golf, Inc. Securities Litigation*,
   381 F.3d 267 (3d Cir. 2004)................................................................20

*In re Burlington Coat Factory Sec. Litig.*,
   114 F.3d 1410 (3d Cir. 1997)..............................................................33

*Industria De Alimentos Zenu S.A.S. v. Latinfood U.S. Corp.*,
   679 F. Supp. 3d 53 (D.N.J. 2023) ......................................................24

*Kaufman v. i-Stat Corp.*,
   165 N.J. 94 (2000)...................................................................... *passim*

*Lamorte Burns & Co. v. Walters*,
   167 N.J. 285 (2001)........................................................... 23, 24, 25

*Lum v. Bank of Am.*,
   361 F.3d 217 (3d Cir. 2004)................................................................33

*MaxLite, Inc. v. ATG Elecs., Inc.*,
  193 F. Supp. 3d 371 (D.N.J. 2016) ....................................................37

*MaxLite, Inc. v. ATG Elecs., Inc.*,
  No. CV 15-01116, 2024 WL 4764685 (D.N.J. Nov. 13, 2024) .........................38

*Modis, Inc. v. Bardelli*,
  531 F.Supp.2d 314 (D. Conn. 2008) ..................................................10

*Mortellite v. Novartis Crop Prot., Inc.*,
  460 F.3d 483 (3d Cir. 2006) ..........................................................28

*New Jersey Carpenters & the Trs. Thereof v. Tishman Const. Corp of New Jersey*,
  760 F.3d 297 (3d Cir. 2014) ...........................................................8

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
  575 U.S. 175 (2015) .................................................................33

*P.C. of Yonkers, Inc. v. Celebrations!*,
  No. 04-4554, 2007 WL 708978 (D.N.J. Mar. 5, 2007) ................................17

*P.C. Yonkers, Inc. v. Celebrations the Party & Seasonal Superstore*,
  428 F.3d 504 (3d Cir. 2005) ...........................................................9

*Philip Morris USA, Inc. v. Lee*,
  481 F. Supp. 2d 742 (W.D. Tex. 2006) ..............................................38

*Phillips v. County of Allegheny*,
  515 F.3d 224 (3d Cir. 2008) ...........................................................8

*Printing Mart-Morristown v. Sharp Electronics Corp.*,
  116 N.J. 739 (1989) ...................................................... 22, 23, 24, 26

*Pulte Homes, Inc. v. Laborers' Int'l Union of N. Am.*,
  648 F.3d 295 (6th Cir. 2011) ............................................... 11, 15, 17

*ResMan, LLC v. Karya Prop. Mgmt., LLC*,
  No. 4:19-CV-00402, 2019 WL 4394564 (E.D. Tex. Sept. 13, 2019) .................14

*Rolo v. City Inv. Co. Liquidating Trust,*
  155 F.3d 644 (3d. Cir. 1998)...............................................................................27

*Ryanair DAC v. Booking Holdings Inc.,*
  636 F. Supp. 3d 490 (D. Del. 2022).................................................... 10, 14, 16

*Ryanair DAC v. Booking Holdings Inc.,*
  No. CV 20-1191-WCB, 2024 WL 3732498 (D. Del. June 17, 2024) .......... 13, 17

*Shurgard Storage Centers, Inc. v. Safeguard Self Storage, Inc.,*
  119 F. Supp. 2d 1121 (W.D. Wash. 2000).................................................... 13, 17

*SMH Enters., L.L.C. v. Krispy Krunchy Foods, L.L.C.,*
  No. CV 20-2970, 2021 WL 1226411 (E.D. La. Apr. 1, 2021)...........................13

*St. Johns Vein Ctr., Inc. v. StreamlineMD LLC,*
  347 F. Supp. 3d 1047 (M.D. Fla. 2018).................................................. 12, 15, 16

*Teva Pharms. USA, Inc. v. Sandhu,*
  291 F. Supp. 3d 659 (E.D. Pa. 2018) ..................................................... 10, 14, 16

*United States v. Carlson,*
  209 F. App'x 181 (3d Cir. 2006) .............................................................. 11, 15, 17

*United States v. Drew,*
  27 F. App'x 164 (4th Cir. 2001) ....................................................... 11, 14, 15, 17

*United States v. Lowson,*
  No. CRIM. 10-114 KSH, 2010 WL 9552416 (D.N.J. Oct. 12, 2010).......... 13, 17

*Universal Health Services, Inc. v. U.S.,*
  579 U.S. 176 (2016)..................................................................................... 27, 32

*Van Dam Egg Co. v. Allendale Farms, Inc.,*
  199 N.J. Super. 453 (App. Div. 1985) ......................................................... 29, 36

*Varacallo v. Massachusetts Mut. Life Ins. Co.,*
  332 N.J. Super. 31 (App. Div. 2000) ........................................................... 28, 37

*Velop, Inc. v. Kaplan*,
301 N.J. Super. 32 (App. Div. 1997) ..................................................................25

*Victaulic Co. v. Tieman*,
499 F.3d 227 (3d Cir. 2007)..............................................................................20

## Statutes

18 U.S.C. § 1030 ................................................................................ *passim*

N.J.S.A. § 2A:38A-1 .........................................................................................19

N.J.S.A. § 2A:38A-2 .........................................................................................20

N.J.S.A. § 2A:38A-3 .......................................................................... 17, 18, 19, 21

## Rules

Fed. R. Civ. P. 8 ................................................................................................37

Fed. R. Civ. P. 9 ................................................................................ *passim*

Fed. R. Civ. P. 12 ...............................................................................................8

## I.    PRELIMINARY STATEMENT

This action arises not out of any legitimate effort to protect "Covered Persons," but out of a calculated and technologically abusive scheme by Plaintiff Atlas Data Privacy Corporation ("Atlas") to manufacture statutory claims, overwhelm US Data Corporation's ("USD") computer systems, and profit from engineered noncompliance. USD's counterclaims plead in extensive detail a coordinated spam-based cyberattack, misrepresentations, and unauthorized computer access carried out by Atlas and others acting in concert, all of which caused substantial operational, technological, and economic harm to USD. Atlas' attempt to dismiss USD's well pled Counterclaims must be denied.

## II.    STATEMENT OF FACTS

### A.    Atlas Created a Mass Litigation Scheme Exploiting Daniel's Law

Atlas designed and executed a business model premised on recruiting thousands of purported "Covered Persons" ("Assignors"), obtaining alleged assignments of their statutory rights, and then launching mass litigation against data-related businesses without regard to whether any legitimate statutory violations occurred. *See* CC[1] at ¶¶ 13–15.

Rather than acting to immediately protect safety interests of its Assignors, Atlas collected alleged assignments for months – ultimately amassing a claimed

---

[1] "CC" refers to USD's Counterclaims set forth in its Answer, Affirmative Defenses, Counterclaims, and Demand for Jury Trial (Doc. No. 58).

approximately 20,000 Assignors – all the while withholding purported nondisclosure requests for about six months until Atlas reached sufficient scale to initiate its plan. *Id.* at ¶¶ 17-18. Atlas did not verify whether its Assignors actually qualified as Covered Persons under Daniel's Law, nor whether USD possessed or disclosed any "Protected Information" belonging to any such individuals. *Id.* ¶¶ at 19-20. Atlas also failed to advise Assignors of USD's business practices, terms of use, privacy disclosures, or opt-out mechanisms, instead steering them toward a preset list of target companies selected by Atlas. *Id.* at ¶¶ 14, 21.

### B. Atlas Ignored USD's Opt-Out Platform and Launched Spam Attack

USD is not a "people search" website, it is a business-to-business ("B2B") direct marketing company providing marketing solutions, marketing lists, and data services to contractual customers, and it maintains a preexisting, public, customer-agnostic opt-out platform, https://www.usdatacorporation.com/opt-out/, that automatically processes removal requests regardless of status under Daniel's Law. *Id.* at ¶¶ 1, 23. Atlas deliberately chose not to use that platform. *Id.* at ¶¶ 22-23.

Instead, shortly after the New Year, Atlas transmitted tens of thousands of nearly identical emails to USD from a single unknown domain (@atlasmail.com), sending ~7,000 emails per day between about January 6 and January 13, 2024. *Id.* at

¶¶ 22-24, 28, 47.[2] These emails were spam, created, generated, and auto transmitted by Atlas itself, not by any Cover Person as required by statute. *Id.* at ¶¶ 15-16, 19, 24-27. Atlas misrepresented the emails were valid and contained properly protected information under Daniel's Law with the intent of creating mass confusion, frustrating compliance, and falsely manufacturing claims for Atlas. *Id.* at ¶¶ 13-16, 19, 24-28, 40, 42-43.

The volume, timing, and uniformity of the emails caused USD reasonably to believe that its systems were under a spam attack. *Id.* at ¶ 28. The attack flooded USD's servers and email infrastructure, disrupting operations and impairing the availability and integrity of its systems. *Id.* at ¶¶ 40, 47-49.

## C.    USD Acted Promptly and in Good Faith to Address the Requests

Despite reasonably believing its systems were under attack, USD acted in good faith and immediately began processing email requests, and contacted Atlas via email on January 19, 2024 (no phone number provided) asking Atlas to stop flooding USD systems, and implored Atlas to work with USD in a reasonable manner. *Id.* at ¶ 29. USD repeatedly attempted to collaborate with Atlas to establish a rational and efficient compliance process, requesting, e.g., that future requests be submitted in usable .csv form. *Id.* at ¶¶ 29-30 ("happy to review, manage, and get

---

[2] USD denies receipt of some or all of the alleged nondisclosure requests. CC at ¶ 26.

back to [Atlas] regarding these requests – but there has got to be a better way then flooding [USD's] email.") Atlas did not respond. The email onslaught continued.

USD followed up again on January 23, 2024, noting it had more than 30,000 emails all from "@atlasmail" and requesting engagement to address same. *Id.* at ¶ 30 ("Your website has no other way to contact you other than this email address. Please respond, we are now up to over 30,000 emails from your company!!").

Following nearly a week of no response from Atlas, "Matt" from Atlas finally responded to USD via phone representing that Atlas would assist USD and facilitate compliance through use of Atlas' "dashboard," which representations were also made on January 27, 2024 via email, but Atlas repeatedly delayed, stalled, and failed to meaningfully cooperate. *Id.* at ¶¶ 31-35, 89-90. For example, on January 30, 2024, USD advised Atlas it was working on accessing the dashboard over the coming weeks (Atlas did not respond), and on February 19, 2024, USD reached back out to Matt due to inability to access Atlas' "compliance dashboard." *Id.* at ¶¶ 33-35. Atlas failed to respond. USD followed up with Matt at Atlas via email on February 21, 22, and 26, 2024 along with a number of calls that went unanswered. *Id.* at ¶ 35.

When Atlas finally responded, on or about February 26, 2024, it was not to assist in access to the dashboard, but rather to inform USD that Atlas already filed suit. *Id.* at ¶ 36. A few days later, Atlas advised USD that it would walk it through the "compliance platform"; however, by that time USD no longer needed the

platform as it had painstakingly processed ~48,700 email requests – despite the improper manner in which Atlas had transmitted them – and confirmed its compliance. *Id.* at ¶¶37-39. Atlas nonetheless proceeded with litigation.

### D.    Court-Ordered Lists Confirm Atlas' Intentional System Overload

Pursuant to Court Orders, Atlas was required to produce lists identifying the alleged nondisclosure requests. *Id.* at ¶ 41. Those lists confirm that Atlas artificially inflated the volume of emails by sending multiple separate emails on behalf of the same Assignor – sometimes five or more – each referencing different data fields. *Id.* at ¶¶ 43, 46. The lists further demonstrate inconsistent numbers of requests, one listing 48,302 and the other claiming 48,294[3] alleged emails on behalf of roughly 19,000 Assignors, confirming that the email barrage was intentionally engineered to overwhelm USD's systems and create multiple claims per individual. *Id.* at ¶¶ 44-48. Further, Atlas intentionally provided the lists in formats that were unsearchable, uneditable, and incompatible with compliance platforms, further evidencing an effort to frustrate compliance rather than facilitate it. *Id.* at ¶¶ 49-50.

Counsel for USD, later reached out to Atlas asking that ongoing requests be submitted through USD's pre-existing opt-out platform and reiterating USD's prior request that bulk opt-outs be provided in .csv file format to streamline processing.

---

[3] USD counsel requested an explanation of the discrepancy between the number of purported opt-out requests on these two lists and Atlas never provided an explanation *Id.* n.5,  USD processed over 48,700 emails from @atlasmail.

*Id.* at ¶ 51. Atlas refused to provide a .csv file absent a one-sided "confidentiality" agreement, refused to negotiate the terms thereof, and thereafter continued to send emails rather than use USD's opt-out platform. *Id.* at ¶ 52.

### E.   Atlas' Conduct Constituted Unauthorized Computer Access and Caused Substantial Damage

USD's computers, platforms, and databases are protected computers used in interstate commerce. *Id.* at ¶ 65. USD customers must submit a request to USD, payment, and agreement to USD's Terms and Conditions ("T&C") to gain access. *Id.* at ¶ 53. The T&C, amongst other things, state customers "shall not: re-rent, re-use or re-market any list, or otherwise permit any use of the products or services by or for the benefit of any party other than Client, or otherwise publish, distribute or permit disclosure of the products or services, other than to employees of the Client for use in the Client's business or as contemplated on the face of this Invoice." *Id.* at ¶ 54. Under the T&C, a customer "agrees to reimburse US Data for all claims, damages, costs, and expenses, including reasonable attorney's fees, incurred by USD arising out of Client's use of the products or services, or Client's failure to comply with the [T&C]." *Id.* at ¶ 55. Neither Atlas nor the named plaintiffs are customers of USD and were not authorized to access or use USD's systems or data. *Id.* at ¶¶ 57-60, 67, 95. Atlas is believed to have used fraudulent means to access USD's systems with at least one other unknown actor, i.e., creation of a fake account and/or unauthorized access through some third party posing as a customer. *Id.* at ¶¶ 58-59.

6

Atlas falsely claims USD "failed" to respond to notices and claims USD made information available (which USD denies) – which information would only be permissibly accessed by a USD customer bound by USD's T&C. *Id.* at ¶¶ 55-57.  In addition, Atlas' transmission of tens of thousands of emails in a coordinated fashion constituted intentional unauthorized access, exceeding authorized access, and impairment of USD's systems under both the federal Computer Fraud and Abuse Act ("CFAA") and the New Jersey Computer Related Offenses Act ("CROA"). *Id.* at ¶¶ 66-69, 74-76.

As a result of Atlas' conduct, USD's business was harmed, for example, in responding to the spam attack, deciphering, documenting, and correcting records and data, disruption and impaired use of its computers, systems, and responding to and addressing unauthorized access, damage assessment costs, restoration costs, and interruption of services.  *Id.* at ¶ 61.  USD incurred about $70,000 in labor and remediation costs, suffered over $120,000 in lost revenue, and was forced to cease accepting new New Jersey data business. *Id.* at ¶¶ 61-62, 76.

**F.    Atlas' Deliberate and Malicious Misrepresentations and Interference**

Atlas started its attack on or about January 6, 2024 with the volume of emails artificially and purposefully inflated, shortly after New Years when USD was not operating at full staffing levels following the holiday closure, and targeted USD's email systems rather than utilizing USD's opt-out platform. *Id.* at ¶¶ 40-43. Atlas

knowingly misrepresented that it was cooperating with USD to achieve compliance while secretly working to manufacture claims and sabotage USD's operations. *Id.* at ¶¶ 89-90. Atlas falsely represented that its mass emails were valid requests from Covered Persons and knowingly failed to verify Assignor and covered information status. *Id.* at ¶¶ 103-104. Atlas' conduct intentionally interfered with USD's customer relationships, disrupted business operations, and caused USD to suspend services in New Jersey. *Id.* at ¶¶ 84-86. Atlas acted purposefully, maliciously, and in concert with others to unlawfully access USD's systems, violate its T&C, and create litigation leverage through technological abuse. *Id.* at ¶¶ 48, 59, 110-114.

## III.   **LEGAL STANDARD**

On a Rule 12(b)(6) motion, the Court accepts well-pled facts as true and draws reasonable inferences in the non-movant's favor. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *New Jersey Carpenters & the Trs. Thereof v. Tishman Const. Corp of New Jersey*, 760 F.3d 297, 302 (3d Cir. 2014). Pleadings survive if they state a claim that is plausible and contain facts to "suggest the required elements" or "raise a reasonable expectation that discovery will reveal evidence" supporting the elements. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 55 (2007); *Phillips v. County of Allegheny*, 515 F.3d 224, 234 (3d Cir. 2008). Courts do not weigh evidence or demand proof at this stage. *Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 570.

Fraud claims must satisfy *Fed. R. Civ. P.* 9(b) by pleading the who, what,

when, where, and how, but courts apply the rule with practicality, permitting allegations based on information uniquely in the other party's possession to be pled on belief. *Gross v. Coloplast Corp.*, 434 F. Supp. 3d 245, 249 (E.D. Pa. 2020); *Craftmatic Sec. Litig. v. Kraftsow*, 890 F.2d 628, 645 (3d Cir. 1989).

## IV.    LEGAL ARGUMENT

### A.    USD sufficiently alleges Atlas violated the CFAA

CFAA claims require "(1) damage or loss [] during any 1-year period . . . aggregating at least $5,000 in value; (2) caused by; (3) violation of one of the substantive provisions of §§ 1030(a) or (b)." *Advanced Fluid Sys., Inc. v. Huber*, 28 F. Supp. 3d 306, 326 (M.D. Pa. 2014), *aff'd*, 958 F.3d 168 (3d Cir. 2020) (internal quotes/cites omitted) (alteration in original); *see* 18 U.S.C. § 1030(g); *Christie v. Nat'l Inst. for Newman Stud.*, No. CV 16-6572 (FLW), 2019 WL 1916204, at *4 (D.N.J. Apr. 30, 2019). "The CFAA prohibits seven types of computer crimes involving unauthorized access to computers (or access in excess of authorization) which results in obtaining information from or damaging the computer." *Huber*, 28 F. Supp. 3d at 326. Relevant to this matter, the CFAA precludes:[4]

(1)    Intentional    access    to    a    computer    without

---

[4] Civil actions under CFAA are not limited to violations of subsection (a)(5). *See P.C. Yonkers, Inc. v. Celebrations the Party & Seasonal Superstore*, 428 F.3d 504, 511 (3d Cir. 2005); *Andritz, Inc. v. S. Maint. Contractor, LLC*, No. 3:08-CV-44(CDL), 2009 WL 10674137, at *4 (M.D. Ga. Feb. 4, 2009).

authorization or exceeding authorized access,[5] and thereby obtains "information from a protected computer."[6] 18 U.S.C. § 1030(a)(2)(C).

(2) Access to a protected computer or exceeding authorized access "knowingly and with intent to defraud," and "by means of such conduct further[ing] the intended fraud and obtain[ing] anything of value, unless the object of the fraud and the thing obtained consists only of the use of the computer and the value of such use is not more than $5,000 in any 1-year period." *Id.* at (a)(4).

(3) "[K]nowingly caus[ing] the transmission of a program, information, code, or command, and as a result of such conduct, intentionally caus[ing] damage without authorization, to a protected computer." *Id.* at (a)(5)(A).

"[A] plaintiff must show *either* damage or loss." *Farmers Ins. Exch. v. Auto Club Grp.*, 823 F. Supp. 2d 847, 852 (N.D. Ill. 2011) (internal quotes/cites omitted) (emphasis in original); *see also* 18 U.S.C. § 1030(g). "Damage" is "any impairment

---

[5] "Exceeds authorized access" means authorized access used "to obtain or alter information in the computer [to which] the accesser is not entitled[.]" 18 U.S.C.§ 1030(e)(6). "[T]he statute imposes liability on one who acts beyond the scope of her access authority." *Teva Pharms. USA, Inc. v. Sandhu*, 291 F. Supp. 3d 659, 668 (E.D. Pa. 2018). Where a username and password are required to access a website, access obtained in violation of the terms of service exceeds authorization. *Ryanair DAC v. Booking Holdings Inc.*, 636 F. Supp. 3d 490, 509 (D. Del. 2022).

[6] A "protected computer" is "used in or affect[s] interstate or foreign commerce or communication[.]" 18 U.S.C. § 1030(e)(2)(B). "A computer is 'protected' if it is connected to the Internet." *Teva Pharms.*, 291 F. Supp. 3d at 668; *see also B & B Microscopes v. Armogida*, 532 F. Supp. 2d 744, 757 (W.D. Pa. 2007); *Modis, Inc. v. Bardelli*, 531 F.Supp.2d 314 (D. Conn. 2008). USD's website, servers, email systems, and databases are connected to and used in interstate commerce to provide B2B marketing services across state lines and thus qualify as protected computers.

to the integrity or availability of data, a program, a system, or information." 18 U.S.C. § 1030(e)(8).  A "barrage of calls and e-mails," which "diminish [a party's] ability to use its systems and data because they prevented [the party] from receiving at least some calls and accessing or sending at least some e-mails" constitutes damage under a transmission claim.  *Pulte Homes, Inc. v. Laborers' Int'l Union of N. Am.*, 648 F.3d 295, 301 (6th Cir. 2011).  Such "diminished-ability concept" has been endorsed by numerous courts.  *See id.* at 302; *Am. Online, Inc. v. Nat'l Health Care Disc., Inc.,* 121 F. Supp. 2d 1255, 1274 (N.D. Iowa 2000) ("[W]hen a large volume of [unsolicited bulk e-mail] causes slowdowns or diminishes the capacity of [the party] to serve its customers, an 'impairment' has occurred to the 'availability' of [the party's] 'system.'").  Indeed, in *United States v. Carlson*, 209 F. App'x 181 (3d Cir. 2006), the defendant was convicted for "sending thousands of e-mails to one e-mail address, which would clog the address" and thereby caused damage. *See also United States v. Drew*, 27 F. App'x 164, 164 (4th Cir. 2001) (CFAA "clearly criminalizes [] bombarding [] with massive numbers of e-mail messages.").

"Loss" means "any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service."  18 U.S.C. § 1030(e)(11).  A party "can satisfy the CFAA's definition

11

of loss by alleging costs reasonably incurred in responding to an alleged CFAA offense, even if the alleged offense ultimately is found to have caused no damage as defined by the CFAA." *Farmers Ins.*, 823 F. Supp. 2d at 854; *see also Brooks v. AM Resorts, LLC*, 954 F. Supp. 2d 331, 338 (E.D. Pa. 2013) (Loss includes "the cost of remedial measures taken to investigate or repair the damage to the computer" or "lost revenue resulting from a plaintiff's inability to utilize the computer while it was inoperable because of a defendant's misfeasance."); *Cline v. Reetz-Laiolo*, 329 F. Supp. 3d 1000, 1049 (N.D. Cal. 2018) ("The cost of investigating unauthorized access and securing a computer network constitutes a 'loss' under the statute."). Losses asserted by the claiming party need not be robust to survive dismissal. *See St. Johns Vein Ctr., Inc. v. StreamlineMD LLC*, 347 F. Supp. 3d 1047, 1062 (M.D. Fla. 2018) (denying dismissal where plaintiff alleged "lost time and effort needed to take subsequent remedial measures" to prevent future breaches, "other expenses" responding to the unauthorized access and "assessing the scope of intrusion," disruption in the day-to-day operations, and devotion of "substantial resources to managing its" data). *St. Johns Vein Ctr.* string cites nine cases wherein allegations from identifying, investigating, or ascertaining the extent of unauthorized access, resecuring servers, or conducting damage assessments were all sufficient to withstand dismissal. *Id.*; *see also B & B Microscopes*, 532 F. Supp. 2d at 758 (damage assessment and lost revenue due to service interruption sufficient).

There are two main differences between 18 U.S.C. § 1030(a)(2) and (a)(4) – first, "subsection (a)(4), unlike (a)(2), requires that a person act with the '*specific intent to defraud*'" and second, "a person violates subsection (a)(2) by merely obtaining '*information*,' while (a)(4) requires that the person obtain '*anything of value*.'" *SMH Enters., L.L.C. v. Krispy Krunchy Foods, L.L.C.*, No. CV 20-2970, 2021 WL 1226411, at *4 (E.D. La. Apr. 1, 2021) (internal cites omitted) (emphasis in original). Fraud under CFAA means "'simply . . . wrongdoing' and does not require 'proof of the common law elements of fraud.'" *Id.* at *5 (quoting *Shurgard Storage Centers, Inc. v. Safeguard Self Storage, Inc.*, 119 F. Supp. 2d 1121, 1126 (W.D. Wash. 2000)) (alteration in original). Defraud means "'wronging one in his property rights by dishonest methods or schemes.'" *Id.* (quoting *Shurgard Storage Centers*, 119 F. Supp. 2d at 1126); *see also Ryanair DAC v. Booking Holdings Inc.*, No. CV 20-1191-WCB, 2024 WL 3732498, at *21 (D. Del. June 17, 2024) (Courts look for "evidence of deceit."); *Fidlar Techs. v. LPS Real Est. Data Sols., Inc.*, 810 F.3d 1075, 1079 (7th Cir. 2016) (defraud means intent to deceive or cheat). "[C]ourts have found that a plaintiff states a claim under § 1030(a)(4) when it alleges that the defendant participated in dishonest methods to obtain the plaintiff's secret information." *SMH Enters*, No. CV 20-2970, 2021 WL 1226411  at *6 (internal quotes omitted); *see also United States v. Lowson*, No. CRIM. 10-114 KSH, 2010 WL 9552416, at *7-8 (D.N.J. Oct. 12, 2010) (finding intent to defraud properly pled

where defendant accessed site in contravention of terms of service); *ResMan, LLC v. Karya Prop. Mgmt., LLC*, No. 4:19-CV-00402, 2019 WL 4394564, at *3 (E.D. Tex. Sept. 13, 2019) (plaintiff sufficiently pled defendant provided database access to third party in violation of terms of service).

A "person who did not directly access the computer may still be liable under the CFAA if he 'directs, encourages, or induces' someone else to access a computer that he himself is unauthorized to access." *Teva Pharms.*, 291 F. Supp. 3d at 671 (cite omitted); *see also Huber*, 28 F. Supp. 3d at 328 (sufficient allegations of conspiracy to gain access); *Ryanair*, 636 F. Supp. 3d at 499.

### 1. Unauthorized Access / Exceeding Authorized Access (§ 1030(a)(2)(C); § 1030(e)(6))

Atlas is not a USD customer and had no permission to access USD's systems or data. Yet Atlas claims to have accessed USD's system and gained information from same, in violation of USD's restricted use and T&Cs. Atlas further orchestrated a concentrated, high-volume email campaign—approximately 48,000 messages sent over days from a single domain, including multiple emails per individual—to overwhelm USD's privacy infrastructure. Courts recognize that accessing a system in violation of terms or by automated, flood-style tactics constitutes access "without authorization" or "exceeds authorized access" at the pleading stage. *See Ryanair,* 636 F. Supp. 3d at 509 (D. Del. 2022); *Teva*, 291 F. Supp. 3d at 668, 671; *United States v. Drew*, 27 F. App'x 164, 164 (4th Cir. 2001).

14

### 2.    *Damage and Loss; $5,000 Aggregate Threshold (§ 1030(e)(8), (e)(11))*

Damage under 18 U.S.C. § 1030(e)(8) includes any impairment to the availability of a system. Atlas orchestrated a post-holiday surge of ~48,000 auto-generated emails into USD's emails, flooding same, blocking use and communications, and overwhelming systems – i.e., the precise "impairment of availability" multiple courts recognize as "damage." *See Pulte Homes*, 648 F.3d at 301-02 (mass calls/emails diminished ability to use systems); *Am. Online*, 121 F. Supp. 2d at 1274 (bulk email causing slowdowns impairs "availability"); *Carlson*, 209 F. App'x 181 (thousands of emails clogging address constitutes damage); *Drew*, 27 F. App'x at 164 (bombardment with e-mail messages creates damage).

Loss includes reasonable costs to respond, investigate and restore systems, and consequential damages from service interruption. 18 U.S.C. § 1030(e)(11). USD pled loss incurred in responding to the spam attack, deciphering, documenting, and correcting records and data, and responding to and addressing unauthorized access, damage assessment costs, restoration costs, and interruption of services, with about $70,000 incurred in labor and remediation costs. Courts hold that employee time, investigation, mitigation, and restoration costs suffice at the pleading stage. *See Farmers Ins.*, 823 F. Supp. at 852-54; *St. Johns Vein Ctr.*, 347 F. Supp. 3d at 1062; *B & B Microscopes*, 532 F. Supp. 2d at 758.

USD pleads both "damage" (impairment to the availability and integrity of its

email/server systems) and "loss" (reasonable response, investigation, and restoration costs; and interruption-related lost revenue), easily surpassing the $5,000 threshold in a one-year period. *See Farmers Ins.*, 823 F. Supp. at 852-54; *St. Johns Vein Ctr.*, 347 F. Supp. 3d at 1062; *B & B Microscopes*, 532 F. Supp. 2d at 758.

### 3. *Subsection-Specific Elements Are Met*

  i. *§ 1030(a)(2)(C) – Obtaining information from a protected computer without authorization or by exceeding authorized access.*

By deliberately triggering processing of and access to USD's internal systems and data flows through an engineered, automated email flood as well as alleged access to USD's systems to purportedly confirm non-compliance – all contrary to USD's T&C and in lieu of the public opt-out portal – Atlas obtained information and access to which it was not entitled. *See* CC at ¶¶ 22-23, 29-39, 53-57, 66-69; *see also Teva*, 291 F. Supp. 3d at 668–71; *Ryanair*, 636 F. Supp. 3d at 509.

  ii. *§ 1030(a)(4) – Knowing access with intent to defraud, furthering the fraud to obtain anything of value.*

The Counterclaims plead a dishonest scheme: Atlas recruited nearly 20,000 "assignors," withheld and then batch-deployed tens of thousands of duplicative emails to manufacture noncompliance, feigned cooperation while obstructing CSV/dashboard access, and supplied unsearchable lists all to seek litigation leverage and financial gain. "Defraud" under the CFAA encompasses dishonest methods depriving another of property rights, and "anything of value" is construed broadly.

*See Shurgard Storage Ctrs.*, 119 F. Supp. 2d at 1126; *Fidlar Techs.*, 810 F.3d at 1079; *Lowson*, No. 10-114, 2010 WL 9552416, at *7–8; *Ryanair*, No. 20-1191-WCB, 2024 WL 3732498, at *21. Atlas' actions clearly demonstrate same.

> iii.    *§ 1030(a)(5)(A) — Knowingly causing the transmission of information and, as a result, intentionally causing damage without authorization*

Atlas "caused the transmission" of the email barrage that impaired USD's system availability and integrity. *See Pulte Homes*, 648 F.3d at 301-02; *Am. Online*, 121 F. Supp. 2d at 1274; *Carlson*, 209 F. App'x 181; *Drew*, 27 F. App'x at 164.

> iv.    *Causation*

USD ties its harms – system slowdowns, operational disruption, ~$70,000 in response costs, >$120,000 in lost revenue, and a temporary halt on New Jersey intake – directly to Atlas' concentrated campaign, obstruction, and unauthorized access, which more than plausibly alleges causation under § 1030. *See Huber*, 28 F. Supp. 3d at 326; *B & B Microscopes*, 532 F. Supp. 2d at 758.

## B.    USD Sufficiently Pled a Claim for relief under CROA

To state a claim under CROA, *N.J.S.A.* 2A:38A-3**,** a party must allege: (1) at least one of the statute's purposeful or knowing unauthorized acts, and (2) resulting damage to business or property. *Id*. at (a)-(e); *Fairway Dodge, L.L.C. v. Decker Dodge, Inc.*, 191 N.J. 460, 468 (2007); *P.C. of Yonkers, Inc. v. Celebrations!,* No.

04-4554, 2007 WL 708978, at *8 (D.N.J. Mar. 5, 2007).  *N.J.S.A.* 2A:38A-3[7] states:

> A person or enterprise damaged in business or property as a result of ***any of the following actions*** may sue . . . :
>
> a. The purposeful or knowing, and unauthorized altering, damaging, taking ***or*** destruction of any data, database, computer program, computer software ***or*** computer equipment . . . ;
>
> b. The purposeful or knowing, and unauthorized altering, damaging, taking ***or*** destroying of a computer, computer system or computer network;
>
> c. The purposeful or knowing, and unauthorized ***accessing or attempt to access*** any computer, computer system or computer network;
>
> d. The purposeful or knowing, and unauthorized altering, accessing, . . . a financial instrument; ***or***
>
> e. The purposeful or knowing accessing and ***reckless*** altering, damaging, destroying ***or*** obtaining of any data, data base, computer, computer program, computer software, computer equipment, computer system or computer network.
>
> [(emphasis added).]

### 1.    *USD Adequately Alleges the First CROA Element*

Atlas acted "purposefully or knowingly" and without authorization and/or

---

[7] Atlas narrowing CROA to "anti-hacking" is incorrect. CROA prohibits actions enumerated five subsections. *See Ferring Pharms. Inc. v. Watson Pharms., Inc.*, No. 2:12-CV-05824 (WJM), 2014 WL 12634303, at *6 (D.N.J. Aug. 4, 2014) (denying dismissal where defendant accessed a restricted webcast by evading password); *Auto. Res. Mgmt. LLC v. Favo*, No. CV 21-2630 (SRC), 2022 WL 1080991, at *3 (D.N.J. Apr. 11, 2022) (CROA prohibited accessing work email post-termination).

recklessly, violating CROA §§ (a)-(c) and (e). Under CROA, "access" includes "instruct[ing], ***communicat[ing] with***, stor[ing] data in, retriev[ing] data from, **or otherwise [using] any resources of a computer, computer system, or computer network**." *N.J.S.A.* 2A:38A-1(a) (emphasis added). Courts recognize "access" includes *communication-based* intrusions. *Atlas Data Corp. v. REIPRO, LLC*, Dkt. No. MRS-L-231-24 (Feb. 21, 2025) (Purcaro Cert., **Exhibit A**).

Here, Atlas engaged in unauthorized communication with USD's systems by transmitting nearly 48,000 spam, auto-generated emails to USD right after New Years and when USD was not operating at full staffing levels following the holiday shutdown rather than, and refusing to use, USD's existing opt-out platform. Such massive spam attack is exactly the type of access intrusion CROA prohibits under §§ 2A:38A-3(a), (b) , (c) , and (e) .

Atlas deliberately flooded USD's computers after spending months collecting ~20,000 Assignors and withholding their purported "requests" until Atlas aggregated a critical mass for its attack. Atlas transmitted ~48,000 auto-generated emails to USD immediately after the New Year. Multiple emails per Assignor with various combinations of addresses and numbers were designed to artificially inflate email volume. Atlas sent these emails to USD's email inbox, not to USD's established opt-out platform and further stalled, ignored, and refused to work with USD in a reasonable business manner despite USD's diligent efforts. Atlas feigned

cooperation and, while giving the false representation of same, prepared and filed suit against USD. USD plainly describes "purposeful or knowing unauthorized" and/or "reckless" accessing, taking, altering, or damaging. The attack was timed and designed to damage USD's systems and its actions after were aimed at running statutory deadlines to manufacturing bogus claims for Atlas' benefit.

Atlas gained or attempted to gain access by unauthorized or fraudulent means. Atlas is not a customer and has no authorization to access USD's system. Atlas accessed USD's platform or data by fraudulent means and in violation of USD's T&C (i.e., misrepresentation as a customer and/or using an unauthorized third-party account). Atlas improperly accessing USD's systems by circumventing USD's T&C is sufficient to satisfy pleading requirements, particularly when accepted as true.[8]

### 2.    *USD Adequately Alleges the Second CROA Element*

USD sufficiently pleads damage to its business and property. CROA expressly recognizes that "property or services, including the use of computer time" are compensable and that value is measured by fair market value or the cost of generating, obtaining, or storing data. *N.J.S.A.* § 2A:38A-2. Atlas' attack directly disrupted USD's business operations, overwhelmed USD's email, and caused

---

[8] Fact-intensive disputes cannot be resolved on a 12(b)(6) motion. *In re Adams Golf, Inc. Securities Litigation*, 381 F.3d 267, 277 (3d Cir. 2004); *Victaulic Co. v. Tieman*, 499 F.3d 227, 234 (3d Cir. 2007); *Gaetano v. Gilead Sciences, Inc.*, 529 F. Supp. 3d 333, 348 (D.N.J. 2021).

"disruption of use" as a result. These allegations are sufficient to plead damages. USD was forced to address the cyberattack and divert resources to handle and respond to the deluge, and take action to prevent further harm.[9] Such allegations go beyond minimal pleading threshold.

Nearly identical conduct by Atlas, i.e., allegations of a mass-email cyberattack, has been held sufficient to plead business damage. Indeed, it was foreseeable that sending tens of thousands of emails in a compressed timeframe could disable a system, impede operations, and disrupt a company's ability to serve customers – satisfying N.J.S.A § 2A:38A-3(e). *See Atlas Data Corp. v. REIPRO, LLC*, Order at 21. The same logic applies here. Atlas overwhelmed USD's system, triggered security measures, and diverted resources – clear, cognizable CROA damage.

### 3.     *Atlas is Wrong on the Law and the Facts for CROA*

Atlas mischaracterizes USD's allegations. USD does not claim merely the "appearance" of a cyberattack; it pleads specific, non-conclusory facts showing intentional and unauthorized access that caused business disruption. USD alleges that nearly 48,000 auto-generated emails deliberately timed around the holidays

---

[9] As a result of Atlas' conduct, USD incurred substantial business disruption, interference, and measurable damages estimated at about $70,000 in remediation costs alone. The attack consumed significant employee time, resources, and caused revenue losses estimated at about $120,000. All cognizable damage.

were directed to its sales inbox rather than its designated opt-out channel. These emails bypassed the opt-out platform's domain-blocking protocols, clogged USD's systems, impaired system functionality, and prevented USD from conducting business. Even after numerous pleas directly to Atlas to please stop "flooding" USD, such unauthorized communications persisted. Atlas had actual knowledge of its lack of authorization for these communications but continued nonetheless.

Atlas further asserts that no "damage" or "taking" was alleged, misstating both CROA's statutory requirements and the nature of the claims. CROA does not impose a damage-to-computer standard – but even if it did, USD alleged same. Further, as detailed above, USD alleged business harm is consistent with the statute. Atlas' suggestion that the emails were "ordinary" is contradicted by the detailed facts pled. Likewise, its claim that no facts show Atlas knew harm was likely ignores not only common-sense damage resulting from Atlas' barrage, but also the actual notice Atlas received alerting it of the damage it was causing. USD further linked the damage caused to Atlas' conduct clearly – indeed, same is easily inferred.

USD pled particularized facts of purposeful, unauthorized, and reckless conduct under CROA's broad "access" standard, not mere conclusory assertions.

### C.    USD Sufficiently Pled a Claim for Relief for Tortious Interference

The elements for tortious interference are: (1) reasonable expectation of economic benefit or a contract; (2) lost due to malicious interference, and (3)

damages as a result. *Avaya Inc., RP v. Telecom Labs, Inc.*, 838 F.3d 354, 382 (3d Cir. 2016); *Printing Mart-Morristown v. Sharp Electronics Corp.*, 116 N.J. 739. N.J. 739, 750–52 (1989); *Fineman v. Armstrong World Indus.*, 980 F.2d 171, 186 (3d Cir. 1992). USD sufficiently alleged facts in support of each element of this claim.

### 1.   *Reasonable Expectation of Economic Benefit Plausibly Pled*

"An action for tortious interference with a prospective business relation protects the right to pursue one's business, calling, or occupation, free from undue influence or molestation. Not only does the law protect a party's interest in a contract already made, but it also protects a party's interest in reasonable expectations of economic advantage." *Lamorte Burns & Co. v. Walters*, 167 N.J. 285, 305 (2001) (internal cites/quotes omitted). A protectable right must be pled, but identification of specific customers lost is not required at the pleading stage.  *Id.*; *see also Heartland Payment Sys., LLC v. Carr*, No. 318CV09764BRMDEA, 2021 WL 302918, at *7 (D.N.J. Jan. 29, 2021) ("[P]laintiff does not need to allege specific prospective customers or contracts to show a reasonable expectation of prospective economic benefit.") (internal quotes omitted). A party need only allege enough facts to show a protective right (a prospective economic or contractual relationship) giving rise to some "reasonable expectation of economic advantage." *Printing Mart.*, 116. N.J. at 751. Prospective economic relationship is defined broadly, including "even the voluntary conferring of commercial benefits in recognition of a moral

23

obligation" or "any other relations leading to potentially profitable contracts." *Fineman*, 980 F.2d at 195 (internal quotes/cites omitted); *see also Printing Mart*, 116 N.J. at 751-753 (reasonable expectation in ongoing/expected sales to the public).

USD is a B2B marketing company based in California and serving businesses through contractual relationships governed by its T&Cs. It had a reasonable expectation of continuing its relationships and business with current and perspective customers, and free from violation under its T&C. USD sufficiently pled its "right to [its] business, calling, or occupation, free from undue influence or molestation" as required for this element. *Lamorte Burns*, 167 N.J. at 305; *Printing Mart*, 116. N.J. at 751.

### 2. *Malicious Interference by Atlas is Sufficiently Pled*

"[M]alicious interference—requires only the intentional doing of a wrongful act without justification or excuse." *Avaya Inc.*, 838 F.3d at 383 (internal quotes/cites omitted). "Wrongful conduct [is] always viewed in the specific context . . . . It is conduct that would not be sanctioned by the rules of the game." *Id.* (internal quotes/cites omitted). "Malice is determined on an individualized basis, and the standard is flexible, viewing the defendant's actions in the context of the facts presented." *Industria De Alimentos Zenu S.A.S. v. Latinfood U.S. Corp.*, 679 F. Supp. 3d 53, 111 (D.N.J. 2023) (internal quotes/cites omitted). Here, "malice is not used in the literal sense requiring ill will . . . . Rather, malice is defined to mean that

the harm was inflicted intentionally and without justification or excuse." *Dello Russo*

*v. Nagel*, 358 N.J. Super. 254, 269 (App. Div. 2003) (internal quotes/cites omitted).

The requisite intent may be "the taking of improper action with knowledge that

interference will probably result." *Velop, Inc. v. Kaplan*, 301 N.J. Super. 32, 49

(App. Div. 1997). "The line clearly is drawn at conduct that is fraudulent, dishonest,

or illegal and thereby interferes[.]" *Lamorte Burns*, 167 N.J. at 307. Allegations that

Atlas "acted out of [its] own self interest to enrich [itself] at the expense of

[defendant] . . . are sufficient assertions of intent and malice." *Austar Int'l Ltd. v.*

*AustarPharma LLC*, 425 F. Supp. 3d 336, 359 (D.N.J. 2019).

Atlas purposefully engaged in a fraudulent scheme to self-profit off Daniel's

Law, and at the expense of Covered Persons and USD. Such self-interested conduct,

i.e., holding back Assignors requests and launching its attack in a manner designed

to frustrate compliance and interfere with USD's business, gives rise to an inference

of malice. Similarly, Atlas' misrepresentations and deceptive practices, feigned

cooperation followed by purposeful obstruction and malicious prosecution,

violations of the T&C, sidestepping of dedicated opt-out processes, targeting email,

and inflating volume all support malice inferences.

### 3.    *Resulting Losses is Plausibly Pled*

For "loss and causation, there must be proof that if there had been no

interference there was a reasonable probability that the victim of the interference

25

would have received the anticipated economic benefits." *Avaya Inc.,* 838 F.3d at 383. "[I]t is sufficient that plaintiff prove facts which, in themselves or by the inferences . . . drawn therefrom, would support a finding that, except for the tortious interference by the defendant with the plaintiff's business . . . , plaintiff would have consummated the sale and made a profit." *Id.*; *see also Printing Mart*, 116. N.J. 739.

USD pled foreseeable losses caused by Atlas' interference. Atlas' coordinated attack disrupted USD operations, disabled use, overwhelmed systems, and blocked communications. USD's forced diversion of resources, disruption of business operations, impairment of ability to serve customers, interruption of interstate commercial activity, and actions to prevent further harm caused business and revenue losses estimated at about $210,0000, which would not have occurred but for Atlas' malicious interference.

### D.    USD Sufficiently Pled a Claim for Relief for Fraud

Fraud requires: (1) misrepresentation of a material fact; (2) knowledge of its falsity; (3) intention of reliance; (4) reasonable reliance; and (5) resulting damages." *Kaufman v. i-Stat Corp.*, 165 N.J. 94, 109 (2000) (internal cites/quotes omitted). *Fed. R. Civ. P.* 9(b) "imposes a heightened pleading requirement for allegations of fraud" requiring "that in all averments of fraud or mistake, the circumstances constituting the fraud or mistake shall be stated with particularity." *Caspersen as Tr. for Samuel M.W. Caspersen Dynasty Tr. v. Oring*, 441 F. Supp. 3d 23, 35 (D.N.J.

2020) (internal cites/quotes omitted). "The [party] need not, however, plead the date, place or time of the fraud, so long as they use an alternative means of injecting precision and some measure of substantiation into their allegations[.]" *Id.* at 35-36; *see also Rolo v. City Inv. Co. Liquidating Trust,* 155 F.3d 644, 658 (3d. Cir. 1998). The pleading must provide notice of the "precise misconduct" giving rise to the fraud charge "to prevent false or unsubstantiated charges." *Caspersen*, 441 F. Supp. 3d at 36 (internal cites/quotes omitted). Courts "apply the rule with some flexibility and should not require plaintiffs to plead issues that may have been concealed by the defendants." *Id.* Particularity of action is required, but mental elements may be inferred and alleged generally. *Id.* at 35.

A material fact has "a natural tendency to influence, or be capable of influencing, [a decision]." *Universal Health Services, Inc. v. U.S.*, 579 U.S. 176, 182 (2016). It is one "a reasonable man would attach importance to . . . in determining his choice [or] if the defendant knew or had reason to know that the recipient of the representation attaches importance to the specific matter in determining his choice of action, even though a reasonable person would not." *Id.* at 193.

The knowledge element, "scienter," calls upon a party to "allege facts giving rise to a strong inference of either reckless or conscious behavior." *Caspersen*, 441 F. Supp. 3d at 39 (internal cites/quotes omitted). "Rule 9(b) expressly provides that [m]alice, intent, knowledge, and other conditions of a person's mind may be alleged

generally. Pleading circumstantial grounds for such knowledge is sufficient to meet the Rule 9(b) standard." *Id.* (internal quotes/cites omitted) (alteration in original). Mental state can be inferred, and the inference need not be irrefutable, i.e., of the "smoking gun" genre or even the most plausible. *Id.* at 40. "The pertinent question is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.*

Reliance is a mental state afforded inferences under *Fed. R. Civ. P.* 9. The intention that the receiving party rely on the misstatement and resultant reliance are intertwined. Reliance may be direct or indirect reliance. "The presumption or inference of reliance and causation, where omissions of material fact are common . . . extended in the context of both common law and statutory fraud." *Varacallo v. Massachusetts Mut. Life Ins. Co.*, 332 N.J. Super. 31, 50 (App. Div. 2000).

"[I]ndirect reliance allows a plaintiff to maintain a fraud action based upon a statement the plaintiff heard not from the party that defrauded him or her but from that party's agent or from someone to whom the party communicated the false statement with the intention that the [plaintiff] hear it, rely on it, and act to his or her detriment." *Mortellite v. Novartis Crop Prot., Inc.*, 460 F.3d 483, 492 (3d Cir. 2006) (internal cites/quotes omitted.) Indirect reliance occurs when the actor makes a misrepresentation to a third party with the intention that it be communicated to and

influence the plaintiff. *Kaufman*, 165 N.J. at 111.[10]

Whether one relied on misrepresentation, and if that reliance was reasonable, is a question of fact for the jury. *Van Dam Egg Co. v. Allendale Farms, Inc.*, 199 N.J. Super. 453, 458 (App. Div. 1985); *Automated Salvage Transp., Inc. v. NV Koninkliijke KNP BT*, 106 F. Supp. 2d. 606, 625-26 (D.N.J. 1999); *Caspersen,* 441 F. Supp. 3d at 40-41. Resultant damages need not be pled specifically – it is sufficient to allege harm due to fraud. *See Avaya Inc.*, 838 F.3d at 388 (damages inferred where actions reduced profits, although by an uncertain amount).

### 1.    *Atlas made Material Misrepresentations*

Atlas engaged in a coordinated, bad-faith scheme involving material misrepresentations and deceit, which fall into four overarching categories: (1) misrepresentations about non-disclosure requests; (2) misrepresentations about cooperation and intent; (3) misrepresentations related to accessing USD's system; and (4) misrepresentations and deceit in furtherance of fraud. Each of these are supported by particularized facts as pled by USD.

---

[10] "Indirect reliance remains . . . an element of a claim of fraud. If a party to a transaction makes a false statement to another party, intending or knowing that the other party . . . will hear it and rely on it, and the second party . . . hears the substance of the misrepresentation, by means however attenuated, and considers the actual content of that misrepresentation when making the decision to complete the transaction, [that] established indirect reliance to support a fraud claim." *Kaufman*, 165 N.J. at 111.

*Non-Disclosure Requests*: Atlas claimed the nondisclosure requests were sent "by each Covered Person," but the emails were autogenerated by Atlas, not the individuals. Atlas misrepresented this fact and concealed that many requests were duplicative or manufactured. Atlas' requests were <u>not</u> valid under Daniel's Law. Atlas created same without verifying if individuals were actually Covered Persons or if USD possessed or disclosed protected information. Yet Atlas misrepresented that tens of thousands of emails were legitimate and verified opt-outs, despite knowing they lacked required identifying information. Atlas sent ~48,000 emails for ~19,000 individuals, intentionally creating the false impression of "cover persons" and artificially inflating volume, mass confusion, and disruption.

*Cooperation and Intent*: Atlas feigned cooperation to conceal a strategy aimed at manufacturing litigation. Atlas provided false assurances of collaboration *though* "Matt" who misrepresented Atlas' willingness to cooperate, including promising dashboard access and claiming to be facilitating compliance, but instead stalling and delaying to create a compliance failure. Atlas falsely portrayed the email avalanche as legitimate opt-outs when it was truly a coordinated mass email spam attack. Atlas concealed its true intent to use the requests and intentionally sabotage compliance to create a "cottage industry" of manufactured legal claims through recruiting and misleading Assignors with preset lists of target companies, including USD, to sabotage USD's business for Atlas' own profit.

30

*Accessing USD's Systems:* USD alleges Atlas, or someone acting on its behalf, accessed USD's systems through deceit. As Atlas could only have accessed USD's platform by misrepresenting itself as a verified paying customer, or facilitating unauthorized access through a third party in violation of USD's T&C, Atlas knowingly misrepresented its status to induce access to USD's system.

*Misrepresentations and Deceit in Furtherance of Fraud*: USD identifies several specific misrepresentations, such as Atlas' false statements regarding cooperation and dashboard access, false statements regarding the legitimacy and origin of the tens of thousands of emails, false statements necessary to gain access to USD's systems; knowing submission of unverified or false claims intended to induce reliance. All of this was done intentionally to harm USD, disrupt its business, and generate revenue for Atlas. These are concrete assertions not vague puffery. *See Castrol Inc. v. Pennzoil Co.*, 987 F.2d 939, 945 (3d Cir. 1993).

In sum, false communications were transmitted beginning January 6, 2024, with continuous mass emailing while USD was on a skeleton crew due to the recent holiday. Additional misrepresentations occurred before the email blast (recruitment, preset target list), during (from Matt at Atlas) and after it (refusals and DCO ruse). The material misrepresentations were made in emails from @atlasmail.com to USD's email, on Atlas' website in Atlas preset target lists, and same were made to Assignors and to USD (via email inbox, refusing to use USD preexisting process),

31

itself a key particularized fact demonstrating mis-delivery and deception.

USD pled detailed falsity and context as to each of Atlas' misrepresentations. USD is a B2B marketing company with not a publicly available people-search website and its services are available only to paying customers abiding by contracted T&C. The "requests" Atlas sent were generic, autogenerated, duplicative emails not from Covered Persons, without individualized data for verification, and sent to the wrong place. Atlas' malintent is demonstrated by manufactured volume as the Court-ordered lists showed duplicative entries, mismatched addresses/phones, and multiple emails per individual to artificially inflate counts (e.g., separate emails for multiple addresses and phone numbers). Further, USD details Altas' withholding/timing designed to frustrate compliance as Atlas stockpiled names for months and then timed a 48,000-email blast following holiday closure, all inconsistent with Atlas' professed safety mission. Atlas (not a USD customer) misrepresented authorization/identity to interact with USD systems/data thereby violating USD's T&C.

These misrepresentations were material and outcome determinative. Among other things, these facts go to a reasonable Assignor's decision to sign-up with Atlas and agree to its preselection of USD as well as USD's reaction to the spam attack, and whether to allow access – core, outcome-determinative issues for USD's operations. *See Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988) (materiality

standard); *Universal Health Servs., Inc. v. United States*, 579 U.S. 176, 193 (2016). Representations about what USD does, who it is, if it possessed protected information, if it had received valid opt-out requests, and what Atlas would be doing and how, for example, are quintessentially material facts to Atlas' overall scheme.

USD identifies who (Atlas/Matt), what (false data-broker and "valid request" assertions, false authorization, and compliance claims), when (Jan. 6, 2024 - Feb. 29, 2024, plus the antecedent recruitment and subsequent obstruction), where/how (AtlasMail domain; Atlas' website and list of targets, mis-delivery to USD inbox; court-ordered lists confirming duplication), and why false/material (USD's actual business model; non-Covered-Person, generic, duplicative requests; timing designed to frustrate compliance; unauthorized access; substantial operational/economic harm). These allegations satisfy Rule 9(b). *Frederico v. Home Depot*, 507 F.3d 188, 200 (3d Cir. 2007); *Lum v. Bank of Am.*, 361 F.3d 217, 224 (3d Cir. 2004); *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1422 (3d Cir. 1997); *Craftmatic*, 890 F.2d at 645; *Castrol*, 987 F.2d at 945; *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 183-89 (2015).

### 2.    *Atlas Knew Representations were False and Intended Reliance*

Scienter is satisfied where pleadings allege facts giving rise to a "strong inference of either reckless or conscious behavior." *Caspersen*, 441 F. Supp. 3d at 39 (internal quotes omitted). Rule 9(b) expressly permits mental-state allegations to

be made generally, so long as they are supported by circumstantial indicia of knowledge. *Id.* at 35-36. USD alleges far more than bare assertions, it describes a coordinated, months-long plan in which Atlas knowingly fabricated the essential components of its narrative, including: (a) who USD is; (b) whether its Assignors were Covered Persons; (c) whether the tens of thousands of autogenerated emails constituted valid "requests"; and (d) whether it was working towards compliance.

Atlas knew USD did not publish protected information publicly through a "people search" website yet falsely represented to Assignors that USD was publishing "Protected Information" online. Atlas had full access to USD's public-facing website, which demonstrates, among other things, that USD is a B2B marketing company, not a an online "people search" service provider – yet Atlas placed USD on its preset target list anyway.

Atlas knew its tens of thousands of emails were not individualized requests. Atlas created generic, autogenerated emails devoid of individual information and Atlas sent them, not the Assignors. Atlas intentionally stockpiled these requests for months, waiting to launch a coordinated mass email attack underscoring Atlas' knowledge that the emails were not *bona fide* requests. Atlas' feigned compliance and delay tactics in response to USD's attempt to manage the spam attack further highlight its knowingly deceptive acts.

Atlas knew that many of its Assignors were not verified Covered Persons, it

failed to confirm Covered Person status, failed to confirm USD had any Protected Information, and even failed to verify that its own target list had any factual basis connecting USD to the Assignors. This deliberate disregard for statutory predicates supports scienter under *Caspersen*, which recognizes that intentional blindness or reckless indifference may satisfy the knowledge requirement. Court-ordered lists further confirmed Atlas knew of its falsity as same revealed massive duplication, contradictory information, fabricated volume, and other disqualifying inconsistencies. Atlas' creation of inflated, inconsistent datasets, followed by its refusal to promptly respond to/work with USD, supports a strong inference of knowingly false conduct. Taken collectively, the facts "give rise to a strong inference of scienter," satisfying Rule 9. *Caspersen*, 441 F. Supp. 3d at 39-40.

The intent-to-induce reliance element of fraud may be alleged generally and proven through circumstantial evidence. *Kaufman*, 165 N.J. at 109. Reliance is a state-of-mind element that *Fed. R. Civ. P.* 9 allows to be pled inferentially. *Id.* at 111. USD pled extensive facts (e.g., mass emails, volume, timing of cyber-attack followed by obstruction) showing Atlas' intended that USD rely on its untruths.

The totality of the allegations satisfies Rule 9 requirement to plead the "who, what, when, where, and how" of the fraud scheme. *Gross*, 434 F. Supp. 3d at 249. Atlas acted "with the intention that [the other party] rely on" the misstatements. *Kaufman*, 165 N.J. at 108.

### 3. *USD Reasonably Relied and Sustained Damages as a Result*

USD reasonably relied on Atlas' misrepresentations, and same caused substantial harm. Again, reliance may be direct or indirect. *Kaufman*, 165 N.J. at 109. Where misrepresentations are directed to induce action through third parties or fraud, as here, reliance is foreseeable and reasonable.

USD's reliance was reasonable, it was forced to so rely by design. Atlas intentionally structured its conduct so that USD could not distinguish fraudulent communications from legitimate requests, and "Matt" on behalf for Atlas represented that it was working with USD on compliance, would be providing access to an alternate platform for same, was otherwise cooperating with USD. USD acted reasonably, in accordance with established business practices, when it treated the avalanche of emails as requiring attention, investigation, and technological intervention and when he relied upon Altas' representation that it would assist in streamlining a process to deal with same. Whether reliance is ultimately deemed reasonable is a question of fact. *Van Dam Egg Co.*, 199 N.J. Super. at 458. USD's reliance may be inferred at pleading by Atlas scheme designed to induce it.

Atlas' scheme relied on deceiving Assignors and USD reasonably relied on same indirectly.[11] Atlas intended its misrepresentations to shape Assignors'

---

[11] Indirect reliance is established where false statements are made to one party intending the statements to reach and influence another. *Kaufman*, 165 N.J. at 111.

decisions so Atlas could then weaponize those decisions against USD. This is exactly the type of indirect reliance that satisfies fraud, the Assignors' reliance was both foreseeable and integral to Atlas' plan. *Varacallo*, 332 N.J. Super. at 50. The induced reliance served as the mechanism by which Atlas intended to deceive USD – a classic form of indirect reliance recognized in *Kaufman*.

As detailed, USD's reliance caused severe operational, financial, business and technological harm, e.g., $70,000 in remedial responses and about $120,000 is lost revenue. USD pled injuries that satisfy the damages element of fraud such as disruption of use, expenditure of resources responding to the cyberattack, and the fallout of Atlas' intentional misconduct causing lost revenue, lost profits, and lost business. These are precisely the type of damages that satisfy the fraud element requiring harm "as a result of" reliance. *See Avaya Inc.*, 838 F.3d at 388.

### E.    USD Sufficiently Pled a Claim for Relief for Civil Conspiracy

"[C]ivil conspiracy[12] is a tort comprised of four elements: (1) a combination of two or more persons; (2) a real agreement or confederation with a common design; (3) the existence of an unlawful purpose, or of a lawful purpose to be achieved by unlawful means; and (4) proof of special damages." *MaxLite, Inc. v. ATG Elecs., Inc.*, 193 F. Supp. 3d 371, 390 (D.N.J. 2016) (internal quotes/cite omitted). "[A]

---

[12]   Civil conspiracy claims are evaluated under Rule 8's general pleading standard. *Hillsborough Rare Coins, LLC v. ADT LLC*, No. CV 16-916 (MLC), 2017 WL 1731695, at *12 (D.N.J. May 2, 2017).

plaintiff need not prove that the unlawful agreement was express or that each participant in the conspiracy knew the exact limits of the illegal plan or the identity of all participants, as long as plaintiff alleges that each participant shared in the general conspiratorial objective." *MaxLite, Inc. v. ATG Elecs., Inc.*, No. CV 15-01116, 2024 WL 4764685, at *9 (D.N.J. Nov. 13, 2024) (internal quotes/cite omitted). Direct evidence is also not needed, only that the agreement "could be circumstantially inferred[.]" *Id.* (internal quotes/cite omitted).

Civil conspiracy is not an independent tort; it is grounded in an underlying actionable wrong thereby requiring an overt act, which proximately causes damages. *Farris v. Cnty. of Camden*, 61 F. Supp. 2d 307, 330 (D.N.J. 1999). The focus is the underlying wrong, not the agreement itself. *Ewing v. Cumberland Cnty.*, 152 F. Supp. 3d 269, 301 (D.N.J. 2015). At the pleading stage, the nature of a conspiracy makes it impossible to provide the details. *Philip Morris USA, Inc. v. Lee*, 481 F. Supp. 2d 742, 747 (W.D. Tex. 2006). Moreover, the identity of all co-conspirators is not required as same may be unveiled in discovery so long as the facts give rise to the inference of an agreement. *Freeman v. Giuliani*, No. CV 21-3354 (BAH), 2022 WL 16551323, at *11 (D.D.C. Oct. 31, 2022).

As detailed above, USD alleged that Atlas acted in concert with others. It could not have launched its attack and accessed USD's systems and data alone. It is easily inferred, particular giving all favorable inferences to USD, that Atlas and

others agreed to commit an unlawful act, i.e., the actions detailed in violation of CFAA, CROA, tortious interference, and fraud. They took overt acts, i.e., the spam attack, misrepresentations, obstruction of compliance, unauthorized access, and USD suffered resulting damages. Atlas' motion must be denied.

## V.    CONCLUSION

For the reasons set forth herein, USD respectfully requests Atlas' motion to dismiss USD's counterclaims be denied in its entirety.

Dated February 3, 2026.                    **GREENSPOON MARDER LLP**

*/s/Kelly M. Purcaro*
Kelly M. Purcaro, Esq.
Kory Ann Ferro, Esq.
One Gateway Center, Suite 2600
Newark, New Jersey 07102
Tel.: (732) 456-8734 or 8746
Kelly.Purcaro@gmlaw.com
KoryAnn.Ferro@gmlaw.com

*Attorneys for Defendant US Data Corp.*